HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| CARPENTERS HEALTH & SECURITY TRUST OF WESTERN WASHINGTON, et al, <br><br> Plaintiffs, <br><br> v. <br><br> NORTHWEST DRYWALL SERVICES, INC., <br><br> Defendant and Third Party Plaintiff, <br><br> v. <br><br> PACIFIC NORTHWEST REGIONAL COUNCIL OF CARPENTERS, UBC, a labor union, <br><br> Third Party Defendant | CASE NO. 3:13-cv-05305RBL <br><br> ORDER DENYING THIRD PARTY DEFENDANT'S MOTION TO DISMISS <br><br> [DKT. #13] |

## I.  BACKGROUND

THIS MATTER is before the Court on a Motion to Dismiss brought by Third Party Defendant Pacific Northwest Regional Council of Carpenters, UBC ("the Union") [Dkt. #13]. Plaintiffs are trust funds that provide benefits to Seattle-area union members. The Trusts are

ORDER DENYING THIRD PARTY DEFENDANT'S MOTION TO DISMISS - 1

attempting to collect over $415,000 in allegedly past due union contributions from Defendant and Third Party Plaintiff Northwest Drywall Services, Inc. The Trusts' claim is based on their interpretation of a union compliance agreement signed by John Willard on behalf of Pacific Northwest Drywall ("PNDW"). Willard owns and operates both PNDW and Northwest but they are separate entities. Northwest sued the Union for fraudulent inducement claiming that it did not intend to, and did not agree to, make Northwest a union shop. The Union claims that Northwest is required to arbitrate its claims under the Compliance Agreement and seeks dismissal of Northwest's third party claim against it. Because Northwest did not sign the Compliance Agreement and did not agree to arbitration, the Motion to Dismiss is DENIED.

A.   Factual Summary

Northwest provides drywall and other surfacing services to residential and commercial customers. Northwest's president, John Willard, had consistently and repeatedly resisted any attempts to unionize his business. In 2010, a contractor approached Willard to see if Northwest could act as a subcontractor on a union job. Because he did not want to unionize his entire business, Willard was only willing to do the work if the Union would allow a single job contract for that project. Willard approached the Union about this possibility, because the Union had permitted single job contracts in the past. However, the Union told Willard that single job contracts were no longer permitted.

Ronald Turner, a Union Service Representative, proposed a workaround: Willard could form a separate union division of his corporation by obtaining a new trade name, bonding, license, and contractor's registration. The union division would have to pay union wages (including agreed-upon union benefits to the Trusts) for that work, but Northwest could continue to do non-union work under its existing contractor license. Simply put, the newly minted division would handle only union work while Northwest would continue to operate as a non-union shop.

This arrangement is referred to as a "double-breasted operation" in the construction industry. Relying on Turner's representations, Willard obtained a separate contractor registration number, license, and bonding for PNDW. PNDW executed a Compliance Agreement with the Union that bound PNDW to the standardized terms that apply to an employer–union relationship. The agreement, a one page form document, was filled out by hand. Willard signed the Compliance Agreement as "President" of PNDW,[1] writing "Pacific Northwest Drywall" on the line titled "Employer" and using (only) PNDW's contractor registration number. *See* Dkt. #14, ex. 1. Northwest's name does not appear anywhere on the form.

The Compliance Agreement incorporates by reference a separate and more detailed Labor Agreement, which requires the employer and the Union to settle disputes using a four-step resolution process. Dkt. #14, ex.3.[2] The process is initiated with the filing of a grievance, which must take place within fifteen days of either party's knowledge of the incident but in no case more than thirty days after the actual incident. The settlement process then begins with Step One, a meeting between representatives of the Union and representatives of the employer, which must take place within fifteen days of the filing of a grievance. The settlement process escalates through two more steps, concluding with binding arbitration (Step Four).

After setting up the double-breasted operation and executing the Compliance Agreement on behalf of PNDW, Willard operated the two divisions the way he and Turner had contemplated. By all appearances the arrangement was a success. PNDW bid and won union work and paid the necessary contributions; the jobs that would employ union workers were

---

[1] Willard is not in fact PNDW's President.
[2] This provision is found in the successor agreement to the original Labor Agreement, but the terms are identical and the Compliance Agreement expressly incorporates any successor Labor Agreements.

sought and obtained using only PNDW's name and registration number. Meanwhile, Northwest continued to operate as a non-union shop. For three years the double-breasted operation continued without incident. But in November 2013 a Trust audit concluded that Northwest owed more than $415,000 in past due contributions, plus late fees. The Trusts appear to claim— in direct contrast to the representations made by the Union— that the Compliance Agreement executed by PNDW was *also* binding on Northwest.[3] Therefore, according to the Trusts, *all jobs* performed after 2010 *by both branches* incurred union contributions. *See* Dkt. #1.

In the face of this unexpected demand from the Trusts, Willard and his son, Justin, claim that they repeatedly and fruitlessly attempted to contact the Union several times in November and December about the seemingly erroneous audit. They did not get a response (at one point, Union representatives were unable to meet because they were in Las Vegas). The Willards did manage to reach the auditors, who said the Union had specifically instructed them to include contributions for non-union jobs performed by Northwest. Despite the representations made by Turner, and after three years of express and implied approval (often in writing), the Union's position was now that double-breasted operations were invalid. The Trusts threatened a lawsuit on January 10, 2013. Finally, around mid-January, John and Justin Willard were able to arrange a meeting with the Union.

On January 22, 2013, the Willards met with four Union representatives (Turner was absent). According to Northwest, the representatives refused to acknowledge the validity of double-breasted agreements, and would not agree to any resolution of the matter. After the

---

[3] In support of this theory, the Trusts incorrectly refer to PNDW as a "d/b/a" of Northwest. However, Labor and Industries records indicate that Pacific Northwest Drywall (PACIFND905K1) is doing business only as Pacific Northwest Drywall, and Northwest Drywall Services, Inc. (NORTHDS974C6) is doing business only as Northwest Drywall Services, Inc. There is no other d/b/a listed for Northwest.

January meeting, Northwest claims, it was unable to get a satisfactory response from the Union despite repeated attempts. Meanwhile, the balance allegedly due to the Trusts was accruing late fees each day negotiations stalled. In April 2013, the Trusts sued Northwest. In turn, Northwest sued the Union for fraudulent inducement based on Turner's representations to Willard. The Union now moves to dismiss.

The Union's sole argument for dismissal is that because PNDW signed the Compliance Agreement, Northwest must exhaust the arbitral remedies provided for in the Labor Agreement before it may seek relief in the courts. Because Northwest did not exhaust the dispute resolution process, the Union claims, the Union may not properly be party to this suit.

Northwest offers two reasons for denying the Union's motion. First, Northwest denies that it failed to exhaust its remedies and contends that it made several efforts to resolve the dispute using the required arbitral process. Second, Northwest claims that, by sandbagging the attempts at arbitration, the Union has waived any right it may have had to use the arbitration requirement to avoid being sued.

## II.  DISCUSSION

**A. The Union has not established that the Compliance Agreement is binding on Northwest.**

The Trusts' claim rests on the assumption that Northwest owes contributions because when Willard signed the Compliance Agreement on behalf of PNDW, he also somehow bound Northwest to the terms of the Labor Agreement. The Union relies on similar logic to reach its conclusion: because PNDW entered into the Compliance Agreement, and the Compliance Agreement requires arbitration of disputes, the Union claims that Northwest is required to exhaust its arbitral remedies before it may sue the Union.

Although public policy favors arbitration, the right to compel arbitration may not be used against a party that has not agreed to submit to arbitration. *See Rimov v. Schultz*, 162 Wn. App. 274, 285, 253 P.3d 462 (2011). "Arbitration traces its existence and jurisdiction first to the parties' contract and then to the arbitration statute itself." *Id.* at 280 (internal quotation omitted). Washington courts attempt to ascertain the intent of the parties "by focusing on the objective manifestations of the agreement, rather than on the unexpressed subjective intent of the parties." *William G. Hulbert, Jr. & Clare Mumford Hulbert Revocable Living Trust v. Port of Everett*, 159 Wn. App. 389, 399, 245 P.3d 779 (2011) (quoting *Hearst Communications, Inc. v. Seattle Times Co.*, 154 Wn.2d 493, 503, 115 P.3d 262 (2005)). "[C]ourts should not make another or different contract for the parties under guise of construction." *Universal/Land Const. Co. v. City of Spokane*, 49 Wn. App. 634, 637, 745 P.2d 53 (1987) (quoting *Corbray v. Stevenson,* 98 Wn.2d 410, 415, 656 P.2d 473 (1982)).

The Union seeks to enforce the terms of the Compliance Agreement against Northwest, but has made no showing (or real effort to show) that the agreement, and thus the arbitration requirement, is binding upon Northwest. The Union has failed to explain why Northwest is even a party to the contract. On its face, the Compliance Agreement names only two parties: (1) the Union and (2) "Pacific Northwest Drywall," with PNDW's registration number. The contract does not mention, even implicitly, Northwest or its registration number. The Union seems to gloss over this fundamental hole in its theory by simply repeatedly referring to Northwest as "Employer" in its pleadings and briefing, even though on the Compliance Agreement only PNDW's name appears on the line titled "Employer." It is wishful thinking by the Union that if you repeat something enough it becomes true. Even viewed outside of the context in which the agreement was made, only a tortuous interpretation of the Compliance Agreement would extend

its reach to Northwest. Considering the circumstances,[4] *no* reasonable interpretation would allow this conclusion. Because the arbitration provision in the Compliance Agreement does not bind Northwest, the Union's motion to dismiss on this basis is DENIED. However, even if Northwest were bound by the Compliance Agreement, the Union waived any right it may have had to compel arbitration.

### B. The Union waived any right to compel arbitration by acting inconsistently with that right.

Northwest also argues that the Union has waived any right it may otherwise have had under contract to avoid trial by compelling arbitration (or by moving to dismiss *without* asking the Court to compel arbitration, as happened here). The Union simply repeats its claim that the "Employer" (which it assumes and apparently asks the Court to assume is both Northwest and PNWD) is bound by the arbitration requirement and the Court simply may not be involved in settling this dispute.

A party seeking to prove a waiver of the right to arbitration has the burden to prove: "(1) knowledge of an existing right to compel arbitration; (2) acts inconsistent with that existing right; and (3) prejudice to the party opposing arbitration resulting from such inconsistent acts." *Hoffman Const. Co. of Oregon v. Active Erectors & Installers, Inc.*, 969 F.2d 796, 798-99 (9th Cir. 1992) (quoting *Fisher v. A.G. Becker Paribas Inc.*, 791 F.2d 691, 694 (9th Cir.1986)).

The pleadings currently before the Court demonstrate that the parties knew of an existing right to compel arbitration. The Union's argument invokes the right as a basis for the Motion to

---

[4] These circumstances include the history of Northwest's resistance to unionization; the representations made by Turner; the formation of PNDW for no other plausible reason than to serve as the non-union shop; and the paper trail of emails between Northwest and the Union supporting all the above.

Dismiss, and Northwest claims the Union waived the right as the basis for their opposition to the motion.

It is also clear that the Union acted in a manner inconsistent with its right to compel arbitration: It did not return Northwest's calls at the outset of the dispute, and it did not escalate the grievance to the next step of the process. And, even now, the Union does not seek to invoke its claimed right to arbitrate. It asks the Court to help it use the right as a shield, but it makes no effort to adjudicate the dispute through arbitration.

Finally, waiver requires prejudice to the opposing party. Here, it appears that the Union could be dismissed without compelling arbitration but then may refuse to arbitrate. The Labor Agreement permits only short periods of time for parties to participate in the dispute resolution process. If the Union is dismissed from this lawsuit, it could plausibly claim that the window for escalating to Step Two has closed. The parties would then end up, once again, in this Court. Furthermore, every day the Union postpones the arbitration, late fees are accruing on the allegedly past due union contributions. This situation has prejudiced Northwest.

Based on these reasons, the Union has waived its right to compel arbitration and may not use the provisions of the Labor Agreement (which never bound the Third Party Plaintiff Northwest in the first place) to avoid being party to this suit. The motion is also DENIED on this basis. Third Party Defendant's Motion to Dismiss is **DENIED.**

**IT IS SO ORDERED.**

Dated this 4th day of February, 2014.

_Ronald B. Leighton_
RONALD B. LEIGHTON
UNITED STATES DISTRICT JUDGE